Argued November 1, affirmed December 19, 1916.
Modified on petition for rehearing January 30, 1917.

# McCOMAS v. NORTHERN PAC. RY. CO.*

(161 Pac. 562; 162 Pac. 862.)

**Public Lands—Railroad Grant—Title.**

1. Act Cong. July 2, 1864, c. 217 (13 Stat. 365), granting land to aid in the construction of the Northern Pacific Railroad, operated as a present grant beginning with the date when the plat of the road was filed in the office of the Commissioner of the General Land Office June 29, 1883, so that *eo instanti* the title of the grantee in all of the land to which the statute applied vested.

**Public Lands—Swamp-lands—Railroad Grant—"Claim."**

2. Under Act Cong. July 2, 1864, granting lands to aid in the construction of the Northern Pacific Railroad free from pre-emption or other claims at the time the line of the road was definitely fixed and a plat filed in the General Land Office, the filing of the swamp-land list by the State of Oregon under act of Congress approved September 28, 1850, c. 84 (9 Stat. 519), applicable to that state by Act March 12, 1860, c. 5 (12 Stat. 3), constituted a "claim" excluding such land from the operation of the railroad grant.

**Adverse Possession—Color of Title—Deed.**

3. The grantee of lands from the State of Oregon which the state had acquired under the swamp-land acts, Act Cong. September 28, 1850, as extended by Act Cong. March 12, 1860, who at once entered into possession, had color of title under his deed.

**Public Lands—Mineral Selections—Statute.**

4. Under the express provision of Act Cong. July 2, 1864, granting lands to aid in the construction of the Northern Pacific Railroad, the indemnity in lieu of mineral lands must be taken out of unoccupied agricultural lands.

**Public Lands—Railroad Grant—Withdrawal—Effect.**

5. Under Act Cong. July 2, 1864, granting land to aid in the construction of the Northern Pacific Railroad, and excluding mineral lands and in lieu thereof giving a selection out of unoccupied agricultural lands, the cancellation or rejection of swamp-land list filed by the State of Oregon under Act Cong. Sept. 28, 1850, as extended by Act Cong. March 12, 1860, constituting such a claim as to exclude the land from the railroad grant, would not operate to extend the grant over a disputed tract in the matter of filing indemnity selections.

*Authorities passing on the question of jurisdiction of State courts over lands of United States are collated in a note in 17 L. R. A. 720.
                                                                    Reporter.

ON PETITION FOR REHEARING.

**Adverse Possession—Public Lands—Grant from United States.**

6. In view of Act Cong. Feb. 14, 1859, c. 33 (11 Stat. 384), admitting Oregon into the Union, Section 4 of which provides that the people of the state shall provide by an ordinance irrevocable without consent of the United States that the state shall never interfere with the primary disposal of the soil within the same by the United States, when the United States issued patents to land, it thereby made a primary disposal of the soil, and the title so transferred was no more immune from the attack of the state courts than if such conveyance had been executed by a private party, and could be defeated by showing of title by adverse possession.

**Courts—Jurisdiction—State and Federal Courts—Swamp-lands—Title.**

7. Where the state's selection of swamp-lands was rejected by the General Land Office, and no patent for any part of the land has ever been granted, title thereto is in the United States, and while it so remains a state court is powerless legally to interfere therewith.

**Courts—State Courts—Jurisdiction—Government Lands.**

8. Although a state court is powerless to interfere with the title of the United States to lands, when two parties are seeking to obtain title to government lands, it is the duty of the court to protect the possession of him who apparently has the better right until the controversy can be adjudicated by the agencies appointed by the United States for that purpose.

[As to acquisition of title to land within railroad right of way by adverse possession, see note in Ann. Cas. 1916D, 1186.]

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.    Statement by MR. JUSTICE BURNETT.

This is a suit by E. W. McComas against the Northern Pacific Railway Company, a corporation, the Farmers' Loan and Trust Company, a corporation, trustee, and other persons unknown to plaintiff, to quiet title to certain lands in Umatilla County. The plaintiff asserts title by prescription.

The defendants claim under the act of Congress of July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound, on the Pacific Coast, by the Northern route": 13 U. S. Stats. at

Large, p. 365.   From a decree in favor of the plaintiff, the defendants appeal.

Affirmed.   Modified on Rehearing.

For appellants there was a brief over the names of *Mr. Charles A. Hart* and *Messrs. Carey & Kerr,* with an oral argument by *Mr. Hart.*

For respondent there was a brief over the name of *Messrs. Raley & Raley,* with an oral argument by *Mr. James H. Raley.*

Mr. Justice Burnett delivered the opinion of the court.

Although other lands are included in the complaint, the parties stipulated disposing of the title to all except the following: Lots 2 and 4 of section 5, and lots 1 and 2, the north half of the northeast quarter, and the northeast quarter of the southeast quarter, of section 7, all in township 5 north, range 30 east, Willamette Meridian.   There is substantially no dispute about the facts in the case.

1. Section 3 of the congressional enactment mentioned reads, in part, as follows:

"That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated,

82 Or.—41

and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections. * * Provided, further, that all mineral lands be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest to the line of said road may be selected as above provided. * * "

The line of the road was definitely fixed, and the plat thereof filed in the office of the Commissioner of the General Land Office June 29, 1883. This act has been construed to operate as a present grant beginning with that date, so that *eo instanti* the title of the grantee vested in all lands to which the statute applied.

2, 3. It appears that the Governor of Oregon, operating under "An act to enable the State of Arkansas and other states to reclaim the swamp-land within their limits," approved September 28, 1850, and made applicable to the States of Minnesota and Oregon by the act of March 12, 1860, filed with the proper authorities of the general government in 1872 a list of lands, including those in controversy, which it claimed were swamp-lands inuring to the State of Oregon under the acts of Congress last mentioned. On August 10, 1892, and March 15, 1895, the State of Oregon conveyed these lands to the plaintiff's predecessors in interest from whom by mesne conveyances he de-

raigns title. The grantees in those deeds at once entered into possession of the realty therein described, and they and their successors in interest have continuously maintained that tenure until the present time, claiming title and have made improvements on the premises amounting in value to $10,000 and upward. As before stated, the plaintiff contends that this constitutes adverse possession under color of title which vests in him the fee-simple estate as against the defendants, although, as the fact appears to be as to some of the disputed subdivisions, the swamp-land claim of the State of Oregon has never been adjusted, while as to others it has been rejected by the officers of the general government. It is agreed that all the realty in question lies within the 40-mile place limits of the railway line, so that if no claim existed against it at the time the line of the road was definitely fixed it would be among the 20 alternate sections per mile on each side of the designated line of road. The contention of the defendants is that the presence of the state's swamp-land list in the proper United States Land Office constituted a claim against the land which took it out of the operation of the grant with the result that the tracts were part of the public domain and not subject to holding by adverse title. Some of this very land was patented to the defendant railway company, which, assuming that the patent had been issued inadvertently, quitclaimed the property to the United States, and then, after the commencement of this suit, filed in the United States Land Office at La Grande what it termed mineral indemnity selections covering the most of the premises in controversy. The defendants say these selections have been approved and depend upon them for their title to the land.

Conceding, as the precedents seem to hold, that the filing of the swamp-land list by the State of Oregon constituted a claim within the meaning of the railway grant excluding the lands from its operation proves too much for the defendants. The plaintiff has clearly established color of title by deed from the state for the very land. He deraigns title from this source which the defendants say took the property out of the operation of the grant. It is beyond question that the property has been in the exclusive possession of the plaintiff and his grantors under this color of title for more than ten years prior to the commencement of the suit.

4, 5. The authority for filing mineral indemnity selections is found in the provision of the congressional statute "that all mineral lands be and the same are hereby excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest to the line of said road may be selected as above provided," that is to say, "no more than ten miles beyond the limits of said alternate section." The indemnity, therefore, must be taken out of unoccupied agricultural lands; but this land has been in fact occupied all this time. Moreover, in *Bardon* v. *Northern Pacific R. R. Co.,* 145 U. S. 535, 545, 36 L. Ed. 806 (12 Sup. Ct. Rep. 856, 860), the Supreme Court of the United States, speaking by Mr. Justice FIELD, in construing this same legislation, said:

"Not only does the land once reserved not fall under the grant should the reservation afterward from any cause be removed, but it does not then become a source of indemnity for deficiencies in the place limits. Such deficiencies can only be supplied from lands within limits designated by the granting act or other law of Congress."

In *Northern Lumber Co.* v. *O'Brien,* 204 U. S. 190, 51 L. Ed. 438 (27 Sup. Ct. Rep. 249), the act was again under consideration. A claim to certain lands within the 40-mile place limit prescribed by the grant made before the Northern Pacific Railway Company had filed its map of definite location was found to be ineffectual, although an order of the Land Department withdrawing it from the category of public lands had been predicated upon it. Under these conditions, Mr. Justice Harlan, speaking for the court, said:

"When the withdrawal order ceased to be in force, the lands so withdrawn did not pass under the latter grant, but became a part of the public domain, subject to be disposed of under the general land laws, and not to be claimed under any railroad land grant."

If the filing of the swamp-land list therefore constituted such a claim as to exclude the land from the operation of the railroad grant, the cancellation or rejection of that list would not operate to extend the grant over the disputed tract. In other words, the grant does not purport to affect or attach to any subsequent status of the title. On the other hand, if the mere filing of the swamp-land list did not affect the title granted *in praesenti* by the congressional enactment, the holding of the plaintiff and his grantors has been clearly adverse for sufficient length of time to ripen into a fee-simple estate as against the defendants. Still further, under the authority of the Bardon Case, the indemnity selections could not be made from any land except what had always been exempt from any claim excluding it from the provisions of the act in the first place. In default of other legislation, the grant embodied in the act of July 2, 1864, attached at the date of the filing of the plat of definite location or never. Whatever the general government

afterward might do toward extinguishing the claim of the state under its swamp-land filing or the assertion of title by the plaintiff it would not inure to the benefit of the defendants in the matter of filing indemnity⁼ selections. The act evidently applied to virgin public domain and to no other, both in the original taking and in subsequent indemnity selections.

The plaintiff comes within the reason of the rule of *Boe* v. *Arnold,* 54 Or. 52 (102 Pac. 290, 20 Ann. Cas. 533), to the effect that one may enter upon public lands, and by holding the same adversely to all persons except the government may acquire title thereto as against those other parties. Under the authorities quoted, it is clear that the rights of the defendant under the act of July 2, 1864, never attached to this land, and that it had no right to include it subsequently in its indemnity selections. It is also equally plain that as between the parties to this suit the adverse possession of the plaintiff and his grantors for more than ten years has vested the title in the latter as against the company.

The decree of the Circuit Court is affirmed.

Affirmed.

---

Modified on petition for rehearing, January 30, 1917.

On Petition for Rehearing.

(162 Pac. 862.)

*Mr. Charles A. Hart* and *Messrs. Carey & Kerr,* for the petition.

*Messrs. Raley & Raley, contra.*

In Banc. Mr. Justice Moore delivered the opinion of the court.

In a petition for a rehearing it is contended that the defendant, the Northern Pacific Railway Company,

which will hereafter be called the company, holds a
legal title to only one of the disputed tracts of land,
that the United States is vested with such title to the
other parcels of the controverted real property, of
which latter premises the state courts have no juris-
diction, and that, this being so, an error was com-
mitted in not reversing the decree.    The transcript
shows that lots 2 and 4 in section 5, lots 1 and 2, the
north half of the northeast quarter, and the northeast
quarter of the southwest quarter of section 7, in
township 5 north of range 30 east of the Willamette
meridian, were selected November 23, 1872, as swamp-
lands by the State of Oregon, which on August 10,
1892, and March 15, 1895, executed deeds therefor to
the plaintiff's grantors and predecessors.    The com-
pany, asserting a right to these lands by virtue of an
act of Congress, received from the United States
patents for the northeast quarter of the southwest
quarter of section 7, June 8, 1906; for lots 1 and 2 in
that section, December 31, 1907; and for lot 2 in sec-
tion 5, May 4, 1909.    After this suit was commenced
the company, considering these tracts of land were ex-
cluded from the operation of its grant by reason of
the state's definite location of swamp-land selection,
and assuming that the patents referred to were erro-
neously issued, executed to the United States, Decem-
ber 4, 1912, a deed for the real property last described,
which deed was duly recorded in the proper county.
Thereafter the company filed in the local land office
at La Grande, Oregon, its mineral indemnity selection
for these lands, and on May 25, 1914, pursuant to such
choice, it received from the United States a second
patent for the northeast quarter of the southwest
quarter of section 7.    The General Land Office re-
jected the state's selection of lot 4 in section 5, and

the north half of the northeast quarter of section 7, for which latter real property the company also filed mineral indemnity selections.

6. The former opinion in this cause proceeds upon. the theory that the company was unquestionably vested with the naked legal title to the northeast quar-, ter of the southwest quarter of section 7, for which it; had received the second patent, but that its right to such land was barred by the adverse occupancy of the premises by the plaintiff and his grantors and prede-, cessors. As to the other tracts for which patents had been received by the company, but which it had attempted to deed to the United States, the naked legal title might well be regarded as being held by the company, notwithstanding the signing and recording of its deed. Like any other contract, a deed, to be valid, requires the *aggregatio mentium* of the grantor and the grantee. In the case before us there is no evidence tending to show that the United States ever ac-, cepted that deed, which evidently appears to have been signed and recorded by the company to circumvent the granting of a part of the relief prayed for in this suit. Section 44 of the act of Congress of February 14, 1859, admitting this state into the Union, contains a clause which reads:

"Provided, that the foregoing propositions, hereinbefore offered, are on the condition that the people of Oregon shall provide by an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof": 11 U. S. Stats. 383.

When the patents were thus issued the United States thereby made a primary disposal of the soil,

and the title so transferred to the company made it no more immune from attack in the state courts than if such conveyance had been executed by a private party. No error was committed in determining that as to all the real property so patented the company held only the naked legal title, which was defeated by the adverse holding of the plaintiff and his grantors.

7. The state's selection as swamp-land of lot 4 of section 5 and the north half of the northeast quarter of section 7 was rejected by the General Land Office, and the company's selection thereof as mineral indemnity was approved by the local office. No patent for any part of this land has ever been granted, and the title thereto is in the United States. While the title so remains, a state court is powerless legally to interfere therewith.

8. It should be the duty of such a tribunal, however, when it finds two parties who are seeking to obtain the title to government land, to protect the possession of him that apparently has the better right until the controversy can be adjudicated by the agencies appointed by the United States for that purpose: *Kitcherside* v. *Myers*, 10 Or. 21; *Jackson* v. *Jackson*, 17 Or. 110 (19 Pac. 847); *Hindman* v. *Rizor*, 21 Or. 112 (27 Pac. 13); *Pacific Livestock Co.* v. *Gentry*, 38 Or. 275 (61 Pac. 422, 65 Pac. 597); *Borman* v. *Blackmon*, 60 Or. 304 (118 Pac. 848).

The decree will therefore be modified so as to enjoin the defendants, their agents, servants, etc., from interfering with or disturbing the plaintiff's possession of the real property last described until the question is determined in the manner suggested. With this alteration the former opinion is adhered to in all respects.       Affirmed.  Modified on Rehearing.