The ANGELINA HOLLY CORPORA-
TION, Plaintiff,

v.

William P. CLARK, Secretary of the
Interior, et al., Defendants.

Civ. A. No. 83–1212.

United States District Court,
District of Columbia.

March 29, 1984.

John P. Foley, Jr., Marcus W. Sisk, Jr., Sisk, Foley, Hultin & Driver, Washington, D.C., for plaintiff.

Pauline H. Milius, U.S. Dept. of Justice, Washington, D.C., for defendants; Mark K. Seifert, Dept. of the Interior, Washington, D.C., of counsel.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons stated below, the Court denies plaintiff's motion for summary judgment and grants defendants' motion for summary judgment.

### Statement of Facts

The facts in this action are undisputed. At issue here is the defendants' rejection of plaintiff Angelina Holly Corporation's ("Angelina Holly") offers for certain noncompetitive oil and gas leases. As authorized by the Mineral Leasing Act of 1920 ("the Leasing Act"), 30 U.S.C. § 181 *et seq.*,[1] the Secretary of Interior ("the Secretary") is charged with the duty of leasing certain Federal lands for oil and gas deposits. The leasing of these lands is done either on a competitive bidding basis within any "known geological structure of a producing oil and gas field ...",[2] 30 U.S.C. § 226(b), or on a noncompetitive basis to the first qualified applicant where the lands are not within a known geological structure ("KGS"). 30 U.S.C. § 226(c).

On February 22, 1980, Angelina Holly, a Texas corporation, filed with defendant, Bureau of Land Management of the United States Department of the Interior ("BLM"), New Mexico State Office, noncompetitive over-the-counter offers for oil and gas leases (numbered NM-A40368 TX, NM-A40369 TX, NM-A40370 TX, NM-A40371 TX, NM-A40372 TX, NM-A40373 TX, NM-A40374 TX, and NM-A40375 TX) on certain parcels of land in Giddings Field which are located in the Giddings/Somerville area of East Texas.

On September 11, 1979, prior to plaintiff's filing of its noncompetitive over-the-counter offers, similar offers (numbered NM-48308 TX, NM-A38409 TX, NM-A38410 TX, NM-A38411 TX, and NM-A38413 TX) were filed by Mr. Charles E. Davidson on parcels of land also located in Giddings Field. Included in the parcels on which Mr. Davidson submitted offers were tracts 305, 306, and 307 in Segment 3. Included in Angelina Holly's offer NM-A40370 were tracts 301, 303, 304, 308, and 313, also in Segment 3, and contiguous to the tracts filed by Mr. Davidson. Mr. Davidson's tract 305 lies between and is contiguous to tracts 301, 303, and 304 for which plaintiff submitted offers. Mr. Davidson's tract 306 lies between and contiguous to tracts 308 and 313 for which plaintiff submitted offers. Also, tract 308 for which plaintiff submitted an offer lies between and is contiguous to Mr. Davidson's tracts 306 and 307.

On December 1, 1980, Mr. Davidson was issued noncompetitive leases for the parcels of land, including tracts 305, 306, 307, and 330.

In a memorandum dated November 21, 1981 from the District Supervisor, Resource Evaluation Branch of the United States Geological Survey ("Survey"), Tulsa,

---

[1]. The lands at issue in this action were acquired by the Federal Government and so are subject to the Mineral Leasing Act of Acquired Lands, 30 U.S.C. § 351 *et seq.* This Act makes acquired lands available for leasing under the same conditions applicable to public domain lands under the Leasing Act.

[2]. A "known geological structure" is defined by regulation as "technically the trap in which an accumulation of oil or gas has been discovered by drilling and determined to be productive, the limits of which include all acreage that is presumptively productive." 43 C.F.R. § 3100.0-5(a).

Oklahoma, to the Chief, Oil and Gas Section of the BLM, New Mexico, the Survey indicated that they were "deferring structural determinations on a number of lease applications. The reasons for the delay are nearby producers or drilling wells that could result in KGS's being established." Exhibit C, Plaintiff's Complaint for Declaratory and Injunctive Relief ("Complaint"). The memorandum concluded by stating that a number of noncompetitive offers were being held in abeyance, including plaintiff's offers. *Id.*

On December 9, 1981, the Director of the Survey issued a memorandum extending the undefined KGS in the Giddings Field region into areas where plaintiff had submitted its noncompetitive offers for oil and gas leases. The Director determined that there was every reason to believe that the extended areas would be productive given the field studies and recent developments in oil production in the Giddings Field area.

Based on the December 9, 1981 undefined KGS extension of Giddings Field, the BLM rejected Angelina Holly's noncompetitive lease offers on February 3, 1982. The BLM stated that "[a]ll the lands in the offers are within an extension to the undefined known geologic structure of the Giddings Field .... Therefore, these lands are available for leasing only [for competitive leasing] under 43 C.F.R. 3120." Exhibit D, Complaint.

On February 22, 1982, pursuant to the applicable regulations, plaintiff gave notice of appeal from the BLM's decision rejecting plaintiff's offers. Plaintiff timely filed its statement of reasons for the appeal with the Interior Board of Land Appeals ("IBLA") on March 8, 1982.

Finally, on January 27, 1983, the IBLA affirmed BLM's decision to reject plaintiff's offers. Angelina Holly Corporation, 70 IBLA 294 (1983).

The average time for processing noncompetitive over-the-counter oil and gas offers from September 1979 through February 1980 in the BLM's New Mexico State Office was approximately 19 months. The longest processing period for such an offer was 29 months, and the shortest period was 7 months. Affidavit of Jacqueline Morales, Oil and Gas Adjudicator, BLM, New Mexico State Office, Defendants' Motion for Summary Judgment. ("Morales Affidavit"). Mr. Davidson's offers were processed within 13 months of his applications and the Angelina Holly offers were processed within 24 months of its applications.

### Conclusions of Law

Plaintiff attacks the Interior Department's ("Interior") final agency decision on two grounds: first, that it and the BLM misapplied the regulatory test for determining the existence of a KGS and second, that there was an abuse of administrative discretion by the BLM through inconsistent and discriminatory treatment of plaintiff by rejecting its noncompetitive lease applications while accepting another similarly situated offeror's applications who applied nearly six months before plaintiff.

■ The Court has the power to review agency determinations under chapter seven of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706. Under section 706 of the APA, the Court may set aside an agency action only where it is shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). It is plain that the standard of review is a narrow one and that the Court cannot substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The Court further recognizes that there must be a judicial presumption favoring the validity of administrative action, particularly where the Congress has empowered the agency with considerable discretion. *E.g., Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1254 (9th Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 69 L.Ed.2d 838 (1980); *Duesing v. Udall,* 350 F.2d 748, 751 (D.C.Cir.1965), *cert. denied,* 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966). Finally, when an agency decision involves matters of scientific expertise, the

Court must show great deference to those agency determinations. *See Baltimore Gas and Electric Co. v. National Resources Defense Council,* 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983) ("When examining ... scientific determination[s] ... a reviewing court must generally be at its most deferential.").

Plaintiff first challenges the Secretary's designation of certain parcels in the Giddings Field area to be within a KGS. Plaintiff argues that the BLM and the IBLA failed to follow their own regulations when they misapplied Interior's definition of a KGS to the tracts at issue and that the geological facts demonstrate that no KGS's are within said tracts.

The Court, however, does not agree. The Mineral Management Service ("MMS")[3] conducted a careful study of Giddings Field, which included an examination of all wells located near Federal acreage to determine the possible extent of the producing reservoirs. The study concluded that:

> unless it can be shown by appellants that a producing oil or gas reservoir definitely does not exist under any part of a nearby Federal mineral tract, then it is the position of the Minerals Management Service that there is a reasonable probability that all of the Federal mineral tracts in this portion of the Giddings Field are underlain by the reservoir of a producing oil or gas field, and that all of the Federal mineral tracts are presumptively productive of oil or gas. Therefore, they should be leased competitively.

Defendants' Motion for Summary Judgment, attachment 1, Letter of Mr. Charles John, District Supervisor, Resource Evaluation, Mineral Management Service, April 16, 1982. Based on material presented by the MMS, the IBLA affirmed the BLM's decision and concluded that there is a "reasonable probability that the land in question is underlain by a reservoir of a produc-

ing oil and gas field." Angelina Holly Corporation, 70 IBLA 294.

Plaintiff argues that IBLA's conclusion that the tracts at issue have a "reasonable probability" of being within a KGS is not the proper standard for determining the existence of a KGS. Plaintiff contends that the term "structure" is a scientific geological term ... and is not subject to opinion or conjecture but must be determined by accepted geographical data. *Id.,* attachment 1, Letter of Angelina Holly to BLA, March 5, 1982 at 2.

Plaintiff, however, misunderstands the standard that is applied by Interior when determining the existence of a KGS. When Congress enacted the Leasing Act, the Secretary was afforded a significant amount of discretion in determining where a KGS is located. The reasons for this are the difficulties in determining the limits of a productive field. *See generally,* Oil Leasing Lands, Hearings Before the Committee on the Public Lands of the House of Representatives on H.R. 3232 and S. 2812, 65th Cong., 2d Sess. The Survey has published a circular which describes to the public the procedures its geologists must employ when determining the existence and limits of a KGS. U.S.G.S. Circular 419 (1959). The circular defines a KGS as "the trap, whether structural or stratigraphic, in which an accumulation of oil or gas has taken place. *The limits of such structure include all acreage that is [sic] presumptively productive."* *Id.* (emphasis added). This definition comports with the definition in 43 C.F.R. § 3100.0-5(a). *See* note 2, *supra.* Quoting from a decision by the Secretary, the circular notes:

> The defining of the boundaries of the geological structure of producing oil and gas fields, under authority of section 32 of the Leasing Act is for administrative purposes and is not for geological character. Accordingly, such boundaries are not to be taken as absolutely and accurately showing the extent in each in-

---

**3.** The Mineral Management Service took over the mineral evaluation studies associated with KGS from the Survey pursuant to Secretarial

Order No. 3071, January 18, 1982. These functions were later transferred to BLA pursuant to Secretarial Order No. 3087, December 3, 1982.

stance of the geological structure producing oil or gas, but they may later be extended or reduced to accord with the facts.

Circular 419, quoting from *Columbus C. Mabry*, 55 I.D. 530 (1936) (Syllabus). Because of the difficulty in defining, with absolute certainty, the limits of a particular structure, the Secretary includes those areas where oil or gas have been discovered by drilling as well as those areas that are presumed to be productive.

■ After careful study, Interior determined that the tracts at issue in Giddings Field are within a KGS. Plaintiff has failed to rebut adequately Interior's conclusion that there are KGS's in the relevant tracts. No factual data was presented by plaintiff at the administrative hearing which could alter Interior's findings. Accordingly, the Court finds that Interior correctly applied its own regulations when it determined that the relevant tracts are within a KGS. The Court, therefore, will not upset that determination.

■ Plaintiff also contends that it was subject to inconsistent and discriminatory treatment by the BLM. It argues that there was a disparity of treatment between plaintiff and Mr. Davidson with regard to noncompetitive offers that were "essentially contemporaneous" and on similar and contiguous tracts of land. Plaintiff's Motion for Summary Judgment at 6. Plaintiff notes that Mr. Davidson's lease offers were filed less than six months prior to plaintiff's offers, yet action on Mr. Davidson's leases occurred more than fourteen months before action on plaintiff's leases was taken. Plaintiff contends that this inconsistent mistreatment constitutes an abuse of discretion and, therefore, plaintiff should be afforded the same treatment that was granted to Mr. Davidson; *i.e.*, the granting of noncompetitive leases upon the relevant tracts.

Although the facts of plaintiff's allegation are not contested by defendant, plaintiff's claim does not amount to a basis for relief. First, it is plain that plaintiff's applications were not filed "essentially con-

temporaneously." There was, as plaintiff recognizes, more than a five-month stretch of time between Mr. Davidson's applications and those of plaintiff. The Court must also be mindful that:

A mere application for a lease vests no rights in the applicant, *Haley v. Seaton*, 108 U.S.App.D.C. 257, 281 F.2d 620 (1960), except the right to have the application fairly considered under the applicable statutory criteria. *Schraier v. Hickel*, 136 U.S.App.D.C. 81, 419 F.2d 663, 667 (1969). But even where an application for a lease is both first in time and filed in response to a government notice that it will receive offers, no legal claim against the Government arises. *Id.* The result is the same where offers were filed long before a determination by the Secretary not to lease. *McDade v. Morton*, 353 F.Supp. 1006 (D.D.C.1973), *aff'd*, 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974). The plaintiffs cannot bind the Secretary when it was the clear intent of Congress to give him discretion.

*Arnold v. Morton*, 529 F.2d 1101, 1106 (9th Cir.1976) (footnotes omitted).

■ Finally, it is plain that the Secretary is under no duty to issue or reject leases within a certain period of time and failure to act on those leases for several years is not unlawful. *Rowe v. United States*, 464 F.Supp. 1060, 1070 (D.Alaska 1979), *aff'd in relevant part*, 633 F.2d 799 (9th Cir. 1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

In this case the agency has provided, by affidavit, the average lengths of time necessary to process offers. In Ms. Morales' affidavit, she states:

From a review of the 67 regular offers for acquired lands in the State of Texas filed from September 1979 through February of 1980 in the New Mexico State Office, I have found that the average time needed to process such a regular offer was approximately 19 months. The longest processing period for such an offer was 29 months, and the shortest period was 7 months.

Morales Affidavit. Further, the handling of plaintiff's application was done in ac-

cordance with the standard procedures of the BLM. *See* Morales Affidavit.

 No evidence has been presented that anything improper was done by the BLM in the handling of plaintiff's application except for the allegation that Mr. Davidson's offers took only 15 months to process, whereas plaintiff's offers took 24 months to process. Although plaintiff is disappointed that Interior did not act on its application sooner, Interior is under no duty to act within a certain time limit. The facts are that prior to acting on plaintiff's lease offer, Interior reasonably changed its decision concerning the areas designated to be within a KGS in Giddings Field. Because of the extension of the undefined KGS in Giddings Field, the tracts at issue could no longer be leased on a noncompetitive basis. Therefore, the Court finds that Interior did not abuse its discretion and finds that it consistently and fairly applied its own regulations as to leasing applications.

Accordingly, the Court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment.